UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

ONLINE PUBLICATION ONLY

-----------------------------------------------------------------x

ADRIANA C. TOMASINO,

                             Plaintiff,

              -against-

ST. JOHN'S UNIVERSITY,

                             Defendant.

                          <u>MEMORANDUM AND ORDER</u>

                          08-CV-2059 (JG) (ALC)

-----------------------------------------------------------------x

A P P E A R A N C E S:

        TUCKNER, SIPSER, WEINSTOCK & SIPSER, LLP
                120 Broadway, 18th Floor
                New York, New York 10271
        By:    William J. Sipser
                *Attorneys for Plaintiff*

        VEDDER PRICE P.C.
                1633 Broadway, 47th Floor
                New York, New York 10019
        By:    Lyle S. Zuckerman
                Roy P. Salins
                *Attorneys for Defendant*

JOHN GLEESON, United States District Judge:

        Adriana Tomasino brings this action against her former employer, St. John's University, pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*. She claims that her former supervisors discriminated against her on the basis of her race, national origin, and religion, and that she was fired in retaliation for complaining about unequal treatment. The university moves for summary judgment, which I grant for the reasons set forth below.

BACKGROUND

Unless otherwise noted, the following facts are either undisputed or set forth in the light most favorable to the plaintiff.

In September 2005, plaintiff Adriana Tomasino viewed an Internet posting advertising a position as a Community Site Coordinator in the Office of Academic Service-Learning ("ASL") at St. John's University, a private Catholic university in New York City. The posting listed Janet Mangione, the associate director of the office, as the point of contact. Tomasino, who held a degree from St. John's and had worked for the university as a tutor and adjunct faculty member, was familiar with the mission of the ASL Office, which assisted students in finding volunteering opportunities related to their coursework and career aspirations. She was also acquainted with Mangione, having met her approximately 14 years before while they were both working for the university. Although she and Mangione were not close, Tomasino recalled occasionally chatting with her at that time, and once, during a casual conversation about the holidays, revealing that her father was Italian and her mother Hispanic.

Tomasino sent an e-mail to Mangione inquiring about the position. Mangione responded that the Community Site Coordinator position had been filled, but that a similar Coordinator position was available, though not yet posted. She explained that the Coordinator position had slightly different duties than the posted position, but required the same qualifications, and that Tomasino should submit the same application she would have submitted for the posted position. After Tomasino applied for the position, Mangione arranged for her to interview for the job, which remained unpublicized. In addition to Mangione, Tomasino met with Darren Morton, the Assistant Vice President for Student Affairs, and James Maher, the Vice President for Student Affairs. She was hired in late October 2005; the Coordinator position was

never publicly posted.  Although Tomasino was originally offered an annual salary of $30,000, Mangione supported her request for an increase of $2000 based on her qualifications and obtained administrative approval for the raise.  Both Tomasino and Melanie Serge, the woman who had been hired as the Community Site Coordinator, reported to Mangione, and the three of them comprised the entire ASL staff.

In late December 2005, Tomasino requested a confidential meeting with Mangione to express her concern that she and Serge were being treated "unequally."  Tomasino complained that Serge called her "hon" in front of students "as if she were my supervisor" and that Serge would lead students into her office "as if she's here to tell me what it is necessary for me to do with the students."  She complained that while she had to describe her current projects at departmental meetings, Mangione did not require Serge to speak and summarized her projects for her.  She complained that while she was expected to comply with the "open-door policy" -- instituted so that students would feel comfortable approaching the staff -- Serge often had visitors in her office with the lights dimmed and the door closed for long periods of time.  She complained that while no one noticed if Serge went to the ladies' room for half an hour, she could not be absent for five minutes without being told that students were waiting for her.  Finally, she complained that when office supplies ran low, Serge did not order them or ask anyone else to order them.

Mangione assured Tomasino that she would address her concerns generally at a departmental meeting to maintain the confidentiality of her complaints.  Mangione did not do so, however, and Tomasino requested another meeting with her in early February 2006 and repeated her complaints.  Still not satisfied with Mangione's response, Tomasino met with Mangione

again on March 28, and on March 29 she requested a meeting with Mangione's supervisor, Morton.

Also on March 29, Tomasino led a "reflections" session in a class at the pharmacy school, in which students were expected to discuss their experiences while volunteering or shadowing professionals. She had not yet observed Mangione or another supervisor lead a "reflections" session, so she devised her own format, dividing the students into groups and telling them to discuss six questions she had previously composed. According to Tomasino, one of the professors, Dr. Joseph Brocavich, told her at the end of the class that he did not mind if she led the sessions in a novel way, but that the format had to be approved by the curriculum committee. She said she was unaware that the curriculum committee's approval was necessary.

Brocavich recalled the class differently. In an e-mail to Mangione, he reported that Tomasino had used an unapproved format for leading the session, and that when he objected, she had told him that the approved format was boring and that hers was better. He noted that another professor had also voiced concerns about Tomasino's use of an unapproved format for the sessions. Although Mangione forwarded Brocavich's e-mail to Morton, Tomasino was never disciplined for the incident.

On April 10, Tomasino met with Morton as she had requested and repeated the complaints she had made to Mangione. In addition, she informed him that since she had complained to Mangione, Mangione and Serge, who chatted over coffee in the mornings, would stop talking and return to their offices when she entered the room. She also complained that Mangione would instruct her not to sit in a particular seat at departmental meetings, purportedly reserving it for a senior member of the department, but would then permit Serge to sit in the seat. Although Tomasino accused Mangione of discriminating against her as compared to Serge, she

did not tell Morton, who is one-quarter Hispanic, that she suspected race was a factor. At that time, she testified, she was herself unsure why she was being treated differently.

In accordance with university policy, Mangione conducted a mid-year review of Tomasino's performance in June. The review required Mangione to rate her performance in three areas, "Objectives," "Values," and "Core Competencies," on a scale of 1 to 5. Mangione gave her a score of 3.5 in "Objectives," 5 in "Values," and 3.8 in "Core Competencies." Under the rating system, a score of 3.5 to 3.9 indicated that an employee's performance "exceeded all expectations" and that the employee "consistently performed at a higher level than required." A score of 4.5 to 5.0 indicated that an employee's performance "far exceeded all expectations" and that the employee "achieved an exceptionally high level of performance in all areas." Tomasino's overall rating, a weighted average of the individual ratings, was 3.9. In the narrative section of the evaluation, Mangione praised Tomasino's writing ability, analytical skills, and her willingness to work at the Staten Island campus when it was short-staffed. She did not criticize her or identify any need for improvement.

On June 15, Tomasino submitted to Morton a seven-page letter disputing her "poor" rating and explaining why she deserved a rating of at least 4 in the "Objectives" category. She wrote that Mangione did not appreciate "the extraordinary amount of energy, time and effort" that she put into her work and that Mangione dismissed her ideas or passed them off as someone else's. Nowhere in the letter did she suggest that Mangione acted that way because of racial bias. In response, Morton reviewed the evaluation process and Tomasino's scores independently and informed her that he saw nothing unfair in either.

In addition to submitting the letter, Tomasino complained about the review to Cynthia Simpson of the university's human resources department. She repeated the same

objections she had made to Mangione and Morton regarding Mangione's differential treatment of her and Serge. Although she accused Mangione of harboring "personal prejudice" against her, she did not suggest that Mangione was racially prejudiced. She protested that she was being treated "like a second-class citizen" because she "was being told what to do whereas Ms. Serge was allowed to do whatever she wanted," and said she wanted to file a formal complaint. Simpson said the examples she gave of differential treatment did not justify filing a claim and advised her to wait. In July, Tomasino reiterated her desire to file a complaint. Simpson then told her that it was important that she first meet with Morton, so Tomasino met briefly with him on July 13 and apprised him of her meetings with Simpson.

Sometime in late July, Tomasino found next to the office copy machine a stack of documents containing her and Serge's mid-year performance ratings and salary, as well as copies of e-mail messages between Mangione and Serge discussing her personality and certain presentations she had made at another college in June. Tomasino was distressed to learn that Serge had received a higher mid-year rating and earned the same salary she did -- $32,000 -- despite having, in her opinion, fewer qualifications. She discussed the papers with at least five people -- none of whom supervised Serge, Mangione, or Morton -- that she thought might be able to help her transfer out of the ASL Office, and shared with two of them a document that revealed Serge's performance rating and salary. A few days later, on July 24, Tomasino met with Morton, showed him the documents, and complained that her salary was the same and her performance rating lower than Serge's. Morton warned Tomasino for disclosing Serge's confidential salary and performance rating to colleagues.

The same day Tomasino also went to Simpson and repeated her previous complaints, including her most recent complaint to Morton. Although Tomasino complained to

Simpson of Mangione's discriminatory and unequal treatment, she did so only in relation to Serge and did not mention racial prejudice as a possible motive. When she again told Simpson that she wanted to file a formal complaint, Simpson told her she did not have grounds for a valid complaint and, according to Tomasino, refused to take one or refer her to the compliance office.

In August, Mangione distributed written "Office Procedures" to Tomasino and Serge at Morton's direction. The procedures required, among other things, that employees call Mangione before 8:30 a.m. if they were going to be late, that a coordinator be present in the office at all times, and that lunches be taken between 11 a.m. and 2 p.m.[1] The latter two requirements created a conflict for Tomasino, who had received permission from Mangione (who was Catholic) in the spring semester to serve as a lector during the Monday 12:15 p.m. Mass with pay and to take her lunch break afterwards.[2] If she continued to serve as a lector during that Mass, however, both she and Serge would be out of the office between 12 p.m. and 1 p.m. (Serge had been assigned the noon lunch hour and Tomasino the 1 p.m. slot.) To accommodate Tomasino, Mangione asked Serge to take her lunch at 1 p.m. on Mondays and told Tomasino she could continue to lector if she took her lunch at 11:15 a.m. That way, Tomasino could attend the service and she or Serge would be on duty between 11 a.m. and 2 p.m.

Tomasino objected to Mangione's proposal in an e-mail to Morton, saying that "the fact that I am told I need to go to lunch at an early hour like 11:15 a.m. is ridiculous" and that the condition was "a perfect example of my feeling like an 'inmate.'" She did not, however, request permission to attend a morning service. Tomasino testified that the proposal was also problematic because she would not be permitted to receive communion at the Mass if she had

---

[1]     Shortly after she received the procedures, Tomasino forwarded them to Morton by e-mail, commenting that rules regarding such "unimportant . . . details" were "disturbing and insulting" and that she "was not in kindergarten."

[2]     A lector assists at a worship service chiefly by reading aloud a liturgical selection. *See* http://www.merriam-webster.com/dictionary/lector.

eaten in the preceding hour, but she does not claim to have raised that issue with Mangione or Morton. She also admitted that she typically attends Mass and receives communion only on Sundays at her own church. Nevertheless, she rejected Mangione's proposed accomodation and did not serve as a lector during the fall semester.

On August 21, Morton issued a written warning to Tomasino outlining deficiencies in her performance. The warning chastised her for discussing Serge's salary and performance rating with colleagues and for failing to adhere to office procedures. It also noted that she had arrived fifteen to thirty minutes late on four specific dates in July, that on July 25 she had failed to call Mangione to inform her that she was taking a personal day, that she sometimes placed notes on her door to notify Mangione that she was leaving for lunch instead of telling her in person, and that, on seven days in July and August, she had left the office for long periods of time without telling Mangione that she was leaving or where she was going. The warning included an "action plan" that required her to reread the employee manual by September 1 and to meet biweekly with Mangione and Morton to discuss her progress in complying with office procedures. It also stated that without "immediate and sustained improvement, further disciplinary action up to and including termination will occur."

Tomasino refused to sign the warning because she felt that its contents, except for the allegation that she had disclosed confidential personnel information, were untrue. She admitted in testimony, however, that she had committed most of the alleged violations, though she excused her noncompliance with office procedures as reasonable under the circumstances. For example, she estimated that she had been late to work three to four times in July, although she was unsure of the exact dates. She testified that she did not call Mangione on July 25 to inform her that she would not be in until the afternoon because she knew Mangione was out of

the office and that she had e-mailed Morton instead.  She conceded that she had sometimes posted a note on her door saying she was out to lunch, but explained that she had done so only when she did not want to interrupt Mangione or when Mangione was out of the office.  And she acknowledged leaving the office at times without telling Mangione where she was going, but that she did so because it would be "awkward" to tell Mangione that she was going to the human resources department to complain about her.

On September 5 at approximately 9:40 a.m., Mangione sent an e-mail to Tomasino and Serge asking Tomasino to give a classroom presentation at 10:45 a.m. and Serge to give one at 1:30 p.m.  Tomasino responded, without explanation, that she could not give the presentation; she later told Mangione that she had a conflicting meeting "of a personal nature." In fact, Tomasino testified, she had two reasons for declining to give the presentation.  First, she had previously received permission to attend an open house held that morning by the university career center, and she believed that she would be better informed when advising students if she went.  Although the open house would be over before 10:45 a.m., Tomasino worried that she would not have enough time to prepare for the presentation after returning.  Second, although she had not scheduled a meeting with anyone in the human resources department or informed them of her intention to drop in, she intended to go to the department that morning to lodge another complaint about Mangione's treatment of her.

Morton, who was copied on Mangione's request and Tomasino's response, sent Tomasino a message asking why she could not do the presentation.  She wrote that she had to go to the human resources department.  He informed her that although she was entitled to meet with human resources, she should have rescheduled her meeting because the presentation was her "priority."  Tomasino responded: "Melanie [Serge] and Janet [Mangione] were both available to

do the presentation -- it did not necessarily have to be my priority . . . Again, as I have mentioned to you before, I will not be a 'slave' in this department because Janet thinks she can unload the work on me when she feels like it -- and when her 'prized' employee Melanie thinks it is beneath her to do . . . ."

After this incident, Morton issued a revised written warning to Tomasino that included the same content as the first warning and also cited as "unacceptable behavior" her refusal to give the presentation and her false implication that she had a scheduled meeting in the human resources department during that time. The warning directed the same "action plan" contained in the previous warning, except that it required Tomasino to reread the employee manual and begin meeting with Morton and Mangione by September 8 instead of September 1. Tomasino told Morton that she did not see any point to making her do either and refused to sign the warning. The bi-weekly meetings never occurred.

On September 13, Tomasino e-mailed Jennifer Petrilli, the university's Director of Employee Relations and Compliance, and requested a meeting, saying that she was "in the midst of a very difficult situation" in her department. Petrilli called her immediately and made an appointment for her to discuss her concerns the following day. When Tomasino arrived for the appointment, Petrilli asked Lawrence Williams, a manager charged with investigating allegations of discrimination, to record her complaint. Tomasino recounted the complaints she had made to her supervisors and Simpson since December and attributed Mangione's differential treatment of her and Serge to racial bias. When Williams asked for any evidence of Mangione's discriminatory intent, Tomasino claimed to have heard Mangione disparage three Hispanic employees. She said Mangione had (1) referred to a student worker as "the nice girl who isn't too bright;" (2) commented that a secretary was "not . . . as bright as they thought she was, so

they might not bring her to the new office;" and (3) remarked that a program coordinator in the pharmacy school was "lazy" and "incompetent," "was almost fired two or three times," and that she was "sorry they didn't get rid of her." Tomasino also reported that Mangione was "would just ignore" Diana Lopez, a Hispanic woman who worked in another department, even though she was usually "more friendly" to other people.

On or about September 26, Mangione assigned to Tomasino two 20-minute presentations about the ASL Office and service learning to be given at an orientation program for pharmacy students on September 29. On September 28, Tomasino corresponded with Alexandra Lopez, a program coordinator for the pharmacy school, who told her that the school had handled orientation presentations on service learning itself for the past few years and that there was no need for someone from the ASL Office to give one. Tomasino passed this information to Mangione. Around 3:30 p.m., Mangione sent Tomasino an e-mail telling her that she had spoken with Brocavich and that he had said ASL's participation in the orientation program would be "most welcome." Mangione again asked Tomasino to give the two presentations and offered to make 400 copies of the information sheet for distribution to the students if she was pressed for time. Tomasino immediately forwarded Mangione's e-mail to Morton, called the request "ridiculous," and accused Mangione of convincing Brocavich that Tomasino needed to do the presentations even though the pharmacy school was not insisting upon them.

Around 6 p.m., Tomasino and Morton spoke on the telephone. He too requested that she give the presentations. By then, Tomasino felt it was too late for her to prepare for the presentations and that it was unfair to force her to give them, but she did not tell Morton whether she would or would not give the presentations. The following morning, Tomasino informed Mangione and Morton by e-mail that she was taking a sick day because she had laryngitis.

Mangione gave the presentations instead.  On the following workday, Monday, October 2, Tomasino again notified Mangione and Morton by e-mail that she was unwell and would be staying home.

Morton testified that when he spoke with Brocavich regarding the incident, Brocavich told him that ASL's exclusion from the original orientation agenda was an oversight and that Tomasino had later claimed that the ASL Office was not prepared to give any presentations.  Following this conversation and Tomasino's continued failure to inform Mangione by telephone when she would not be in the office, Morton consulted with Rodriguez, Maher, and Simpson, and decided to fire Tomasino.  She was officially discharged on October 6, 2006.  Mangione declined to give a personal recommendation to employers who subsequently inquired about her.

## DISCUSSION

A.     *Standard*

Summary judgment is appropriate only if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c)(2).  "An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 720 (2d Cir. 2010).  "A fact is material if it might affect the outcome of the suit under the governing law."  *Id.*  When applying this standard, the court must "resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment."  *See Brown v. Henderson*, 257 F.3d 246, 251 (2d Cir. 2001).

B.    *Analysis*

1.    *Racial and National Origin Discrimination Claims*

Title VII of the Civil Rights Acts of 1964 prohibits employment discrimination against "any individual" that is motivated even in part by that individual's "race . . . or national origin."  42 U.S.C. §§ 2000e-2(a), 2(m).  Under the burden-shifting scheme established by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973), the plaintiff bears the initial burden of establishing a prima facie case of discrimination.  *See Ruiz v. County of Rockland*, 609 F.3d 486, 491 (2d Cir. 2010).  To do so, the plaintiff must show that (1) she is a member of a protected class; (2) she was qualified for the position she held; (3) she suffered an adverse employment action; and (4) the action took place under circumstances giving rise to an inference of discrimination.  *See id.* at 491-92.  If the plaintiff succeeds, she is entitled to a presumption of discrimination, which the defendant may rebut by articulating "some legitimate, non-discriminatory" reason for its action.  *Holcomb v. Iona Coll.*, 521 F.3d 130, 138 (2d Cir. 2008) (quoting *McDonnell Douglas*, 411 U.S. at 802).  If the defendant's proffer is satisfactory, the plaintiff's task is then simply to prove, by a preponderance of the evidence, that the employer's action was in fact motivated at least in part by a prohibited factor.  *See id.*

Tomasino claims that she was subjected to five adverse employment actions: (1) Morton's July 24, 2006 verbal warning to her after she disclosed Serge's salary and performance rating to co-workers; (2) the August 21, 2006 written warning; (3) the revised September 5, 2006 written warning; (4) the condition that she take her lunch break before lectoring at the Monday noontime Mass; and (5) termination.

Of these, neither the warnings nor the condition that she lunch before lectoring qualify as adverse employment actions.  An adverse employment action is "a materially adverse

change in the terms and conditions of employment," such as "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation." *Sanders v. N.Y.C. Human Res. Admin.*, 361 F.3d 749, 755 (2d Cir. 2004) (internal quotation marks omitted). Tomasino has not adduced evidence from which a reasonable factfinder could infer that any of the warnings she received materially altered the terms and conditions of her employment. *See Weeks v. New York State (Div. of Parole)*, 273 F.3d 76, 86 (2d Cir. 2001) (as a matter of law, employer's issuance of a "notice of discipline" and a "counseling memo" were not actionable because "criticism of an employee (which is part of training and necessary to allow employees to develop, improve and avoid discipline) is not an adverse employment action"), *abrogated on other grounds by Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002).[3] The verbal warning was nothing more than a rebuke and the two written warnings required her only to reread the employee manual and meet twice monthly with Mangione and Morton regarding her compliance with office procedures, tasks she did not complete. As for the condition that she take her lunch break before attending Mass (with pay) instead of after, "a mere inconvenience" is not a materially adverse change in working conditions. *Galabya v. N.Y.C. Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000).

Tomasino's termination, on the other hand, was an adverse employment action. St. John's does not dispute that, or that she is Hispanic and was qualified for the Coordinator position. It does contend that the circumstances under which Tomasino was fired do not give rise to an inference of discrimination. Tomasino cites the treatment of Serge, who is not

---

[3]     Negative evaluations, in themselves, may constitute adverse employment actions in the context of *retaliation* claims. *See Zelnik v. Fashion Inst. of Tech.*, 464 F.3d 217, 226 (2d Cir. 2006) (First Amendment retaliation claims); *Treglia v. Town of Manlius*, 313 F.3d 713, 720 (2d Cir. 2002) (Americans with Disabilities Act and Rehabilitation Act retaliation claims).

Hispanic, as a basis for the requisite inference. But the allegedly preferential treatment of another employee can support a plaintiff's prima facie case only if they were similarly situated, that is, they (1) were subject to the same performance evaluation and discipline standards and (2) engaged in comparable conduct. *Ruiz*, 609 F.3d at 493-94. Tomasino does not claim that Serge ever engaged in the sort of conduct -- failure to follow office procedures, disclosure of confidential personnel information, and refusal to conduct presentations -- for which she was reprimanded and ultimately terminated.

Tomasino argues that Mangione's negative comments about other Hispanic employees also support an inference of discrimination. I disagree. None of the alleged remarks, even mention race, or any class of people at all; they are individualized criticisms of a particular employee's intellect or ability. Consequently, they are not evidence of a "discriminatory state of mind." *See Tomassi v. Insignia Fin. Group, Inc.*, 478 F.3d 111, 116 (2d Cir. 2007) ("The relevance of discrimination-related remarks . . . depend[s] . . . on their tendency to show that the decision-maker was motivated by assumptions or attitudes relating to the protected class."). Equally devoid of probative value is Mangione's alleged failure to be as "friendly" as she usually was to Diana Lopez, a woman who did not even work in the ASL Office.

Tomasino has presented, at best, weak evidence that she was fired because of her race. But the burden of establishing a prima facie case is "de minimis," and so perhaps, if the facts are generously construed, these remarks create an inference of discrimination. *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 38 (2d Cir. 1994); *see also Texas Dep't. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981) (burden is "not onerous"); *Zimmerman v. Assocs. First Capital Corp.*, 251 F.3d 376, 381 (2d Cir. 2001) (burden is "minimal"). But whether they do or not doesn't matter because Tomasino is incapable of bearing her ultimate burden of proving that

she was fired because of her race. *See U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715 (1983) ("Where the defendant has done everything that would be required of him if the plaintiff had properly made out a *prima facie* case, whether the plaintiff really did so is no longer relevant.").

St. John's claims that it fired Tomasino because she was often late or absent, failed to inform Mangione of her whereabouts in accord with office procedures, disclosed Serge's confidential personnel information and, most importantly, repeatedly refused to give presentations as instructed by Mangione. Tomasino has failed to present any evidence that these legitimate, non-discriminatory reasons for her termination are false, much less that they are a pretext for unlawful discrimination. She does not deny the conduct that St. John's cites; rather, she tries to explain why her behavior was reasonable. She does not contest, for example, that she sometimes left a note on her door instead of notifying Mangione personally when she left the office, but she argues that she was only being considerate -- she did not want to interrupt Mangione while she was on the telephone. She admits that she knew Serge's salary and performance rating were confidential and that she disclosed them to colleagues anyway, but she argues that she did this only in the course of seeking advice about how to remedy Mangione's treatment of her or transfer out of the department. She does not deny that she refused to give a presentation on September 5, 2006, that she did not in fact have a conflicting appointment, as she implied to Morton, or that she was not required to attend the open house that she asserts would have prevented her from preparing for the presentation. And she does not dispute that she resisted Mangione's direction on September 25, 2006 to give a presentation the next day, that she did not assure Morton she would give the presentation when he spoke with her that evening, or

that she e-mailed Mangione the next morning, saying that she was ill and would not be coming to work.

Moreover, Tomasino offers no reason why Mangione, who invited her to apply for an unadvertised job opening and supported her request for a $2000 salary increase, would, almost immediately after her hiring, begin a racially motivated campaign to disparage her work and selectively enforce office policy against her. *Cf. Grady v. Affiliated Cent., Inc.*, 130 F.3d 553, 560 (2d Cir. 1997) ("[W]hen the person who made the decision to fire was the same person who made the decision to hire, it is difficult to impute to her an invidious motivation that would be inconsistent with the decision to hire."). No reasonable factfinder could conclude on this record that Tomasino was discharged, not for being insubordinate, but for being Hispanic.[4]

2. *Religious Discrimination Claim*

Title VII prohibits an employer from discriminating against an employee by failing to "reasonably accommodate . . . an employee's . . . religious observance or practice" if it can do so without "undue hardship" to the conduct of its business. 42 U.S.C. §§ 2000e(j), 2000e-2(a). The employer is not required to offer the employee's preferred accommodation; it discharges its duty by offering any reasonable accommodation. *See Cosme v. Henderson*, 287 F.3d 152, 158 (2d Cir. 2002). To state a prima facie case that an employer failed to provide a reasonable accommodation, a plaintiff must show that (1) she held a bona fide religious belief conflicting with an employment requirement; (2) she informed her employer of the belief; and (3) she was disciplined for failure to comply with the conflicting requirement. *Knight v. Conn. Dep't of Pub. Health*, 275 F.3d 156, 167 (2d Cir. 2001).

---

[4] Tomasino never alleged what her national origin is. Even if she had, there is no evidence in the record from which discrimination against her on that basis could be reasonably inferred.

Tomasino claims that the condition that she take her lunch break before lectoring, with pay, was unreasonable because 11:15 a.m. is too early to eat lunch. No reasonable factfinder, however, would agree with Tomasino that the proposal was unreasonable, since the arrangement ensured that either Tomasino or Serge would be available to meet with students during lunchtime and accorded Tomasino the privilege of paid time off for religious observance. *See Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 60, 70-71 (1986) (employer's offer of unpaid leave for religious observance is generally reasonable because taking such leave usually "has no direct effect upon either employment opportunities or job status").

Tomasino argues that the proposal was also unreasonable because she would be unable to receive communion when she lectored at the 12:15 p.m. Mass since eating in the hour preceding communion is forbidden. She does not claim, however, that she ever raised this objection before she was terminated. Because Tomasino never gave her employer an opportunity to address the conflict, she cannot make out a prima facie case of religious discrimination. Moreover, even if she had informed her supervisors of this problem, the record does not support her claim. Canon law requires fasting for one hour before receiving communion, not before the Mass begins; there is no reason to believe that Tomasino could not have both eaten lunch after 11:15 a.m. and complied with her obligation to fast. *See Codex Iuris Canonici*, 1983 Code c.919 § 1. Finally, there is nothing in the record from which a reasonable factfinder could infer that the necessity of receiving communion at a noontime weekday Mass, as opposed to a service held in the morning, evening, or on a weekend, was a "bona fide religious belief" held by Tomasino, who, by her own admission, typically took communion only at a Sunday service.

3.        *Retaliation Claim*

Title VII also prohibits an employer from retaliating against an employee because she "opposed any practice" made unlawful by Title VII or "made a charge, testified, assisted, or participated in" a Title VII investigation or proceeding.  42 U.S.C. § 2000e-3(a).  Retaliation claims are analyzed under the same burden-shifting scheme applied to discrimination claims.  To make a prima facie case of retaliation, a plaintiff must show by a preponderance of the evidence that (1) she participated in protected activity known to the defendant; (2) she suffered a disadvantageous employment action; and (3) a causal connection links the protected activity and the employment action.  *See Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 94 (2d Cir. 2001).

The parties dispute when Tomasino engaged in protected activity.  Tomasino claims she did so beginning in December 2005, when she accused Mangione of treating her and Serge unequally; the university argues that she did not do so until September 13 or 14, 2006, when, in her conversations with Petrilli and Williams, she complained for the first time that she was a victim of racial and religious discrimination.  The university is correct.  To receive statutory protection, a complaint need not be formal or made to a compliance officer, but it must at least "protest or oppose statutorily prohibited discrimination."  *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 566 (2d Cir. 2000); *see also Cifra v. Gen. Elec. Co.*, 252 F.3d 205, 217-18 (2d Cir. 2001) (noting conflicting evidence regarding when the plaintiff first complained of discrimination against her "because she was a woman" and thus when she first engaged in protected activity).  It follows that a complaint is not protected activity unless it puts the employer on notice that the employee is protesting unlawful discrimination, as opposed to the lawful distinctions employers routinely draw between employees based on ability, character,

training, and responsibility. If a complaint cannot be reasonably construed to provide such notice, the inference that an employer retaliated against an employee for opposing a practice *made unlawful by Title VII* does not arise.

It is undisputed that although Tomasino complained of "discriminatory" and "unequal" treatment almost immediately upon being hired, she compared her treatment only to that of Serge and never mentioned her race or religion as a possible basis for the discrimination until her September 13 conversation with Petrilli or her September 14 interview with Williams. A reasonable employer would not have understood Tomasino's pre-September 13 complaints to allege invidious discrimination. Indeed, Tomasino testified that, as late as April 2006 -- four months after she claims she lodged her first protected complaint -- she herself still did not know why she and Serge were being treated differently.

Tomasino alleges two retaliatory acts that occurred after her protected September 13 complaint: her termination on October 6, and Mangione's refusal to personally recommend her to other employers. The only basis Tomasino offers for inferring a causal connection between her complaint and those acts is the brevity of the intervening period. "It is, of course, true that temporal proximity can demonstrate a causal nexus." *Slattery*, 248 F.3d at 95. But the alleged retaliatory acts were the culmination of months of progressive discipline, including two written warnings that explicitly threatened termination, imposed before September 13. "Where timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise." *Id.* (holding that plaintiff failed to establish prima facie case). I conclude as a matter of law that no such inference could reasonably be drawn in this case.

CONCLUSION

The motion for summary judgment is granted.


                                                So ordered.

                                                John Gleeson, U.S.D.J.

September 23, 2010
Brooklyn, New York